**DUANE MORRIS** LLP
A Delaware Limited Liability Partnership
By:     Walter J. Greenhalgh, Esquire (Pro Hac Vice)
        Joseph H. Lemkin, Esquire (JHL-2490)
744 Broad Street
Suite 1200
Newark, New Jersey 07102
Telephone:     (973) 424-2000
Facsimile:     (973) 424-2001
Attorneys for Parkview Care and Rehabilitation Center, Inc.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **IN RE:** | : | |
| | : | **Chapter 11** |
| **PARKVIEW CARE AND REHABILITATION** | : | |
| **CENTER, INC.,** | : | **Case No. 08-71867 (DTE)** |
| | : | |
| Debtor. | : | |
| | : | |

**SECOND AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125
OF THE BANKRUPTCY CODE FOR THE DEBTOR'S THIRD AMENDED
PLAN OF REORGANIZATION**

**DUANE MORRIS LLP**
744 Broad Street, Suite 1200
Newark, NJ  07102-3889
Attn:   Walter J. Greenhalgh, Esq.
        Joseph H. Lemkin, Esq.
Telephone:  973-424-2040
Facsimile:  973-424-2001

THIS DISCLOSURE STATEMENT, AND THIRD AMENDED PLAN OF REORGANIZATION (THE "PLAN") DATED JUNE 15, 2010 ANNEXED HERETO AS **EXHIBIT A**, THE BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTOR TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTOR.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN STANDARD TIME, _____ __, 2010, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK (THE "BANKRUPTCY COURT"). YOUR VOTE ON THE PLAN IS IMPORTANT.**

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE THE ESTATE TO EFFECTIVELY REORGANIZE AND PAY NON-PRIORITY GENERAL UNSECURED CREDITORS 100% OF THEIR ALLOWED CLAIMS OVER A PERIOD OF APPROXIMATELY THREE AND ONE-HALF (3.5) YEARS, FROM THE ONGOING OPERATIONS OF THE DEBTOR'S SKILLED RESIDENTIAL NURSING FACILITY AND REHABILITATION CENTER AND USING FUNDS THAT THE DEBTOR HAS ACCUMULATED THROUGH THE PENDENCY OF THIS BANKRUPTCY PROCEEDING. THE PLAN WILL ALSO IMPLEMENT AN INTERIM RESOLUTION WITH THE WORKERS COMPENSATION BOARD OF THE STATE OF NEW YORK ("WCB") REGARDING CERTAIN DEFICIT ALLOCATIONS RELATING TO THE DEBTOR'S FORMER MEMBERSHIP IN A SELF-INSURED WORKERS' COMPENSATION GROUP, THE HEALTH CARE INDUSTRY TRUST OF NEW YORK ("HITNY"). ADDITIONALLY, THE DEBTOR BELIEVES THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL OF THE DEBTOR'S CREDITORS AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE ESTATE. THE DEBTOR RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

BY ORDER DATED _____ __, 2010, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY

INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT IN ITS ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX EFFECT OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## I.  INTRODUCTION

On April 16, 2008 (the "Petition Date"), Parkview Care and Rehabilitation Center, Inc. ("Parkview" the "Debtor" or the "Proponent"), filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtor has remained in possession of its property and continues to manage its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject the Plan dated June, 2010, proposed by the Debtor, a copy of which is annexed hereto as **Exhibit A** (the "Plan").[1]

The Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with Section 1125(b) of the Bankruptcy Code in order to enable a hypothetical, reasonable investor typical of the Voting Classes (as defined herein) contained in the Plan to make an informed judgment about whether to accept or reject the Plan.  **A hearing to consider confirmation of the Plan (the "Confirmation Hearing" will be held on _____ \_\_, 2010 at \_:00 \_.m., Eastern Standard Time**, before the Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato United States Courthouse, 100 Federal Plaza, Central Islip, New York 11722.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for confirmation under the Bankruptcy Code.

---

[1]  Unless otherwise defined, all capitalized terms included in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed and served so they are received **on or before _____ __, 2010_ at _:00 _.m. Eastern Standard Time,** in the manner described within this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Attached hereto as Exhibits are copies of the following documents:

**Exhibit A:**    The Plan;

**Exhibit B:**    Order of the Bankruptcy Court, dated _____ __, 2010 (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan;

**Exhibit C:**    The Liquidation Analysis.

**Exhibit D:**    Debtor's Projections and Narrative Regarding Same

Voting instructions are contained within this Disclosure Statement. To be considered and counted, your original Ballot must be duly completed, executed and filed with:

> DUANE MORRIS, LLP
> ATTN: THELMA SANTORELLI, PARALEGAL
> 744 BROAD STREET, SUITE 1200
> NEWARK, NEW JERSEY 07102

Your Ballot must be received at the address listed above by 5:00 p.m., Eastern Standard Time, on _____ __, 2010. If your Ballot is not timely received, it may not be counted in determining whether the Plan has been accepted. You are urged to carefully review the contents of the Plan and Disclosure Statement, including all exhibits annexed thereto, before making your decision to vote and whether to accept or reject the Plan. If your Claim is impaired (as defined in

this Disclosure Statement) by the Plan, you are entitled to vote to accept or reject the Plan. You should focus particular attention on the provisions of the Plan which affect or impair your rights as they presently exist, if any.

## II. DESCRIPTION OF THE DEBTOR'S BUSINESS AND REASONS FOR THE DEBTOR'S CHAPTER 11 FILING

### A. Background

#### 1. The Debtor's Business

Parkview owns and operates a 169-bed skilled residential nursing and rehabilitation center (the "Nursing Home") located at 5353 Merrick Road in Massapequa, New York.[2] The Nursing Home is a private for-profit facility. The Nursing Home provides a wide range of services including: (a) 24-hour skilled nursing, (b) on-site staff physician, (c) physical, occupational and speech therapy, (d) challenging admissions including infectious diseases and Alzheimer patients, (e) dental services, (f) personalized nutrition, (g) beauty and barber salon, and (h) 24-hour security. Parkview is a significant employer in Massapequa, employing approximately 180-200 people in various health-care, foodservice, security, maintenance, administrative, and professional/management positions.

#### 2. Corporate Structure, Ownership, and Key Employees

Parkview is a sub-chapter S corporation organized and existing under the laws of the State of New York. Currently, David E. Jones and Judith A. Jones are each 50% shareholders of Parkview. Megan Jones is the President of Parkview and is primarily responsible for overseeing all aspects of the Debtor's operations, business affairs, legal affairs and labor/employee relations. Colleen Spitzner, who joined the Debtor in March 2008, is the Debtor's Director of Finance.

---

[2] A nursing home is generally defined as "an entity that provides skilled nursing care and rehabilitation services to people with illness, injuries or functional disabilities."

Parkview also employs Steven Seltzer, Parkview's Administrator, who has been with the Nursing Home since September 2005, and oversees the day to day operations of the Nursing Home.

3.  The Debtor's Prior Long-Term Financial Obligations

The Debtor previously had one primary long term debt obligation, a $650,000.00 term loan from Capital One Bank (the "Bank"), dated June 30, 2003 (the "Loan"). The Loan was secured by a first priority lien which encumbered substantially all of the Debtor's assets. The term of the Loan expired in July 2008. As of the Petition Date, the approximate principal amount due on account of the Loan was $52,244.00.

Both prior to and after its bankruptcy filing, Parkview remained current with its obligations to the Bank and made its final monthly payment on the Loan to the Bank in July 2008. Accordingly, the Loan has been repaid in its entirety and the Debtor has no long term secured debt obligations at this time, and will not require financing in order to implement the Plan.

4.  Assets and Liabilities

As of the Petition Date, the Debtor's going concern value was believed to be no less than $3.5 million. In addition, as of the Petition Date, the accounts receivable of Parkview were valued at approximately $3.0 million and Parkview's inventory was valued at approximately $56,000.00. The Debtor's total liabilities as of the Petition Date totaled approximately $6.9 million.

The Debtor filed its Schedules and Statement of Financial Affairs with the Court on May 1, 2008. As filed, the Schedules reflected assets in the amount of approximately $4,381,509.38, and liabilities in the approximate amount of $5,108,086.75, of which approximately $54,244.00 represented secured obligations and approximately $5,055,842.75 represented unsecured

obligations. As will be set forth in detail below, upon completion of a recent audit, the Workers Compensation Board of the State of New York alleges that the Debtor's HTNY deficit allocation is $1,488,339,18.

### B. Factors Precipitating the Debtor's Chapter 11 Filing

The Debtor's chapter 11 filing was precipitated by, among other things, the costs relating to its pension fund obligations to the Union. Prior to the Petition Date, the Union commenced litigation against the Debtor. Rather than engage in costly litigation, Parkview entered into a consent judgment with the Union in the amount of approximately $861,000. Further, prior to the Petition Date, the Union issued a restraining notice to the Bank on or about March 25, 2008, which hastened the within Chapter 11 filing. The Debtor attempted to negotiate a resolution of the Union debt with the Union without success. This was the only action pending against the Debtor immediately pre-petition where a judgment against the Debtor or a seizure of its property was imminent.

## III. THE DEBTOR'S CHAPTER 11 CASE

This section of the Disclosure Statement discusses and describes the important developments that have occurred in the Debtor's Chapter 11 Case.

### A. The First Day Motions

As is typical in Chapter 11 cases, the Debtor filed various motions at the inception of the Chapter 11 Case. To avoid the potentially disruptive impact the commencement of a Chapter 11 case would have on the Debtor's ability to continue operating, and to facilitate the orderly transition into Chapter 11, the Debtor requested that the Court consider, on an expedited basis, a motion for an Order authorizing the Debtor to satisfy, and directing payroll banks to honor, pre-petition gross salaries, employee benefits and related obligations to the Debtor's employees. Shortly after the Petition Date, on April 25, 2008, the Debtor filed a subsequent motion: (a)

seeking interim relief pursuant to 11 U.S.C. §366(b), (b) authorizing the payment of adequate assurance for post-petition utility services, (c) fixing a final hearing date to determine adequate assurance, and (d) granting other related relief.

The purposes of these initial motions included, <u>inter alia</u>, to: (a) maintain and bolster employee morale and reduce employee attrition during the Debtor's Chapter 11 proceeding; (b) enable the Debtor to continue operating its business in order to facilitate a Chapter 11 reorganization; and (c) preserve the value of the Debtor's estate. These particular motions were critical to the Debtor's ability to continue to provide high quality care and services to its patients.

**B.    The Debtor's Professionals**

The Debtor has retained, pursuant to Orders entered by the Bankruptcy Court, certain professionals to assist it with the administration of the Chapter 11 Case.

1.    <u>Bankruptcy Counsel</u>

On April 21, 2008, the Debtor filed its Application for an Order Approving the Retention of Duane Morris LLP as Bankruptcy Counsel Pursuant to 11 U.S.C. § 327(a) *Nunc Pro Tunc* to April 16, 2007 (the "<u>DM Retention Application</u>") and accompanying Affidavit of Joseph H. Lemkin Pursuant to Sections 327, 329 and 504 of the Bankruptcy Code and Disclosure Pursuant to Federal Rules of Bankruptcy Procedure 2014(a) and 2016(b) and (c) (the "Lemkin Affidavit"). On May 14, 2008, the Court entered an Order granting the DM Retention Application, thereby authorizing Duane Morris to perform any and all legal services for the Debtor as set forth in the DM Retention Application and Lemkin Affidavit.

2.    <u>Accountant/Financial Advisor</u>

On May 16, 2008, the Debtor filed its Application for an Order Authorizing the Retention and Employment of Abbate DeMarinis LLP ("Abbate DeMarinis") as Accountants and Financial Advisors to the Debtor *Nunc Pro Tunc* to April 16, 2008 (the "Abbate Retention Application")

and accompanying Affidavit and Statement of Anthony Abbate, C.P.A. in Support of Application for an Order Authorizing the Employment *Nunc Pro Tunc* of Abbate DeMarinis, LLP as Financial Consultants to the Debtor (the "Abbate Affidavit").  On May 30, 2008, the Court entered an Order granting the Abbate Retention Application, thereby authorizing Abbate DeMarinis to perform any and all financial advisory services for the Debtor, as set forth in the Abbate Retention Application and Abbate Affidavit.

     3.    <u>Special Counsel</u>

On May 23, 2008, the Debtor filed its Application for an Order authorizing the retention of Genser Dubow Genser & Cona, LLP ("Genser Dubow") as special counsel to the Debtor to handle specialized non-bankruptcy litigation including, but not limited to, collection matters, Medicaid/Medicare matters, guardianships and health insurance disputes, *nunc pro tunc* to April 16, 2008 (the "Genser Retention Application") along with the Affidavit of Jack Genser, Esq. in support of same (the "Genser Affidavit").  On June 26, 2008, the Court entered an Order granting the Debtor's Application and authorizing the retention of Genser Dubow *nunc pro tunc* to the Petition Date.

Thereafter, the Debtor determined that it would replace Genser Dubow as special counsel handling non-bankruptcy litigation.  On August 26, 2009, the Debtor filed its application for an order authorizing the retention of Wolf Haldenstein Adler Freeman & Herz LLP (the "Wolf Haldenstein Retention Application").  Thereafter, and pursuant to Order dated November 3, 2009, the Court granted Debtor's application authorizing the retention of Wolf Haldenstein.

     4.    <u>Special Financial Consultant</u>

On June 3, 2008, the Debtor filed an Application to retain Horan Martello Morrone, P.C. ("HMM") as special financial consultant to the Debtor to complete the preparation, filing and certification of certain annual reports required by Medicare and Medicaid pursuant to applicable

law (the "HMM Retention Application"), along with the Affidavit of Anthony L. Morrone in support of same (the "Morrone Affidavit"). On June 26, 2008, the Court entered an Order authorizing the retention of HMM as special financial consultant to the Debtor.

     5.     Healthcare Consultant

On June 18, 2008, the Debtor filed an Application to retain RB Health Partners, Inc. ("RB Health") to act as the Debtor's healthcare consultants, *nunc pro tunc* to the Petition Date, to assist in the enhancement of the Debtor's Medicare reimbursement (the "RB Health Retention Application") along with the Affidavit of Robin A. Bleier, RN, in support of same (the "Bleier Affidavit"). On August 12, 2008, the Court entered an Order authorizing the retention of RB Health as the Debtor's healthcare consultant, *nunc pro tunc* to the Petition Date.

**C.     The Committee and its Professionals**

On April 30, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") to represent the interests of all the Debtor's unsecured creditors. The Committee is comprised of individuals representing the following creditors:

     1199 SEIU Greater New York Funds
     330 West 42nd Street
     27th Floor
     New York, New York 10036
     Attn: Anthony Petrella, Manager, Contracts and Collections

     Sodexho, Inc. & Affiliates
     c/o Adrienne Sturges, Esq.
     6081 Hamilton Boulevard
     Allentown, Pennsylvania 18106

     Chem Rx.
     750 Park Avenue
     Long Beach, New York 11561
     Attn: Michael Schildt

On May 9, 2008, the Committee filed its Application for authorization to retain Ruskin Moscou Faltischek ("RMF") as counsel to the Committee. On May 16, 2007, the Court entered an Order authorizing the Committee to retain RMF as counsel, effective *nunc pro tunc* to the Petition Date.

On July 7, 2008, the Committee filed its Application for an Order authorizing the retention of Klinger & Klinger, LLP. ("Klinger") as accountants/financial advisors to the Committee. On July 7, 2008, the Court entered an Order authorizing the Committee to retain Klinger as accountants/financial advisors, effective *nunc pro tunc* to the Petition Date.

**D.    Claims Process and Bar Date**

1.    Operating Guidelines

Upon the Petition Date, the Debtor became bound by the Operating Guidelines and Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines"). The Debtor has fulfilled and continues to fulfill its obligations under the Operating Guidelines.

2.    Section 341(a) Meeting of Creditors

On May 30, 2008, the Debtor appeared at the section 341(a) meeting of creditors in the Chapter 11 Case conducted by the U.S. Trustee.

3.    Schedules and Statements

The Debtor filed its Schedules and Statements of Financial Affairs (the "Schedules and Statements") with the Bankruptcy Court on May 1, 2008. According to the Debtor's Schedules and Statements, as of the Petition Date, the Debtor had secured liabilities in the approximate amount of $54,244.00, unsecured priority liabilities in the approximate amount of $0.00, and unsecured non-priority liabilities in the amount of $5,055,842.75. According to the Debtor's schedules, the value of the Debtor's assets at the time of the Petition Date totaled approximately $4,381,509.38.

4. Bar Date

On July 15, 2008, the Debtor filed a Motion to set the last date for creditors to file proofs of claim (the "Bar Date"), and approve the form and manner of notice of the Bar Date (the "Bar Date Motion"). The Court granted the Bar Date Motion and on August 15, 2008, the Court entered an Order setting the Bar Date (the "Bar Date Order") of October 10, 2008 at 5:00 p.m. and approving the form and manner of the Debtor's proposed notice to creditors regarding the Bar Date.

Pursuant to the Bar Date Order, the date by which Creditors had to file proofs of Claim in the Chapter 11 Case was October 10, 2008. Any Holder of a Claim against the Debtor who was required to, but failed to file a proof of Claim on or before the Bar Date will be challenged as untimely pursuant to the contemplated claims objection process and may be forever barred from asserting such a Claim against the Debtor's estate.

E. The Debtor's Efforts to Obtain Rebasing of Medicaid Rate From the Department of Health

At the inception of the Chapter 11 Case, the Debtor devoted substantial time to critical analysis of its business operations and funding requirements to identify the most efficient and comprehensive options for resolving its financial difficulties and maximizing value for the benefit of the Debtor's creditors.

In 2005, the principals of the Debtor determined that they should transfer their stock in the Debtor to other family members. One of the primary reasons for this decision was that a transfer would provide the opportunity to "rebase" the Debtor's Medicaid reimbursement rate, as explained below. Because the Debtor's application for change of ownership was filed prior to December 31, 2006, the transfer was eligible for "rebasing," i.e., a re-computation of the facility's Medicaid reimbursement rate based upon the cost experience of the first twelve months

of operation following the change of ownership. This process gives a new operator the opportunity to tailor its cost profiles to maximize Medicaid reimbursement. Although the law was changed to eliminate rebasing for all applications filed after January 1, 2007, the timing of the filing of the Debtor's application allowed the Debtor to remain eligible for rebasing even though its application was not processed to conclusion prior to the January 2007 date.

After the Debtor made its initial application (the "Application") to the Department of Health ("DOH"), the DOH informed the Debtor that the Application was not approvable in its submitted form. Accordingly, the Debtor's principals revised the Application (the "Revised Application") in order to address all questions and concerns raised by the DOH. The DOH staff approved the revised Application in the fall of 2007. It was subsequently approved by the State Hospital Review and Planning Council (the "Planning Council") in December 2007 and by the Public Health Council Establishment Committee (the "Establishment Committee") at its meeting in January 2008. At the full Public Health Council's meeting on January 25, 2008, however, the Revised Application was deferred, pending further negotiations with the Debtor. Based upon meetings and ongoing discussions with New York State officials, the Debtor realized that the re-basing/transfer of stock would not likely gain approval in a timely manner and the ultimate success of such efforts was becoming speculative. As such, the Debtor began considering alternatives for reorganization.

F.      **Sale of Debtor's Assets Pursuant to APA**

1.      In or about January 2008 the Debtor determined that it might be in its interest and the interest of creditors to sell the business operations of the Debtor. It began marketing the Debtor to prospective purchasers in the nursing home field. After considering several arms-length proposals, the Debtor entered into a Letter of Intent with Benjamin Landa, dated May 13,

2009, outlining a transaction for the sale of the Debtor's operations. Thereafter, on or about August 12, 2009, the Debtor and Landa executed the APA.

2. <u>Summary of APA</u>

The following is a summary of certain significant terms that were included in the APA.

    (i)    Purchase Price payable as follows:

        (a)    $2,350,000 paid at closing (plus $150,000 deposit, which was to have been paid upon execution of the APA);

        (b)    $1,500,000 payable to Judith Jones, David Jones on the third anniversary of the closing date;

        (c)    $300,000 per year for 12 years payable to Judith Jones and David Jones, quarterly, commencing on the 1st day of the 4th year following the closing date;

    (ii)    Closing Date - within 45 days after receipt by buyer of the written non-contingent approval of the DOH of buyer's application for a license to operate a skilled nursing home at the Debtor's location.

    (iii)    Buyer had eighteen (18) months to obtain approval from the DOH, which period could be extended to twenty-four (24) months.

    (iv)    Buyer was to make payment of one hundred (100%) percent of allowed claims of Debtor's creditors in three (3) years, following closing;

    (v)    Contingencies:

        (a)    Debtor must deliver an extension of its lease for the premises for a term of not less than 25 years (this contingency was waivable by the Buyer); and

(b)     Approval by the DOH of buyer's certificate of need to obtain a license to operate a nursing home at the Debtor's premises.

(vi)     Additional Provisions:

(a)     Buyer entered into a Side Letter Agreement with Megan Jones, David Jones, Sr. and Judith Jones, which provided certain payments in consideration of the transfer of their personal good-will and covenants not to compete.

## G.     Negotiations With Landlord

As required by the APA, the Debtor attempted to negotiate a lease extension with its landlord (the "Landlord"). However, the Debtor was advised that any negotiation for a lease extension would have to be discussed with the new tenant / Buyer. During the months of December 2009 and January 2010, the Buyer attempted to obtain the required Lease extension, although it appeared that the focus of Buyer's proposals to the Landlord was to purchase the premises outright. When said negotiations failed, the Buyer advised the Debtor that it was purportedly willing to accept an assignment of the existing lease. The Buyer, however, expressed that it had significant concerns with certain terms of the lease. In discussions with the Landlord during the first two weeks of January 2010, the Debtor suggested several options to alleviate these concerns, including: (i) the Debtor's commencement of litigation in order to have the Bankruptcy Court clarify certain terms of the lease agreement; or (ii) a modification to the consideration provided for under the APA.

Based upon the impossibility of proceeding with the APA as negotiated, and also given the speculative nature of achieving a revised APA and/or ultimate DOH approval, the Debtor terminated the APA with Buyer on or about January 13, 2010. As expressed in the Debtor's

First and Second Amended Plan and Disclosure Statement, the sale of the Nursing Home was not the Debtor's only alternative to reorganization. The Debtor will be able to proceed on a stand-alone basis and still pay creditors in full over time.

### H. Negotiations with the Workers Compensation Board

The New York Workers' Compensation Law requires that an employer obtain workers' compensation coverage for all of its employees. Employers meet this requirement by obtaining and maintaining a workers' compensation insurance policy or obtaining self-insurance for workers' compensation. An employer who wishes to self insure for workers' compensation can do so in one of two ways: (1) by becoming an individual self-insurer or (2) by becoming a member of a self insured group.

The Debtor is a former member of a self-insured group, the Health Care Industry Trust of New York ("HITNY" or the "Trust"). HITNY ceased operations on December 31, 2007 and was taken over by the WCB on February 12, 2008 due to its insolvency. In August 2008, the WCB issued invoices to all former Trust members based on the Trust's estimated cumulative deficit of approximately $84 million. Parkview's estimated pro rata allocation was approximately $284,000. The WCB subsequently hired a forensic accounting firm to audit the trust and calculate final assessments, resulting in a reconstructed member deficit of $220 million – triple the original amount. The WCB issued final assessments to all former Trust Members to recover the entire deficit. Parkview's final pro-rata allocation is $1,488,339.18. In addition to the Debtor's pro-rata deficit assessment, pursuant to the Trust Agreement and the Workers' Compensation Law, members of the Trust are jointly and severally responsible for the $220 million Trust deficit.

Parkview is one of approximately 180 health care facilities throughout New York State that are represented by Duane Morris in connection with ongoing proceedings concerning the HITNY deficit liabilities. Duane Morris, on behalf of most of its HITNY clients, has entered into an interim cooperation agreement with the Workers' Compensation Board regarding the HITNY final assessments (the "MOU"). Among other terms, there is a standstill commitment from the WCB that neither it, nor the Attorney General on its behalf, will commence a collection action against those facilities that remit timely a portion (39%) of their monthly invoices. However, upon request, the WCB considered "Hardship Applications" from facilities with extreme financial circumstances that could not meet the reduced monthly payment terms negotiated in the MOU.

In or about March, 2010 Parkview submitted a hardship application and was granted a hardship reduction, which would have required interim monthly payments in the amount of approximately $6,000. With the Debtor's commitment to payoff unsecured creditors over three and one-half (3.5) years, such monthly payments would not have been feasible. The Debtor and the WCB continued negotiations and arrived at an interim agreement (the "Interim WCB Agreement"). Upon entry of an order confirming the Plan, the Interim WCB Agreement contemplates that the Debtor will remit smaller monthly payments ($3,750.00) over the same three and one-half (3.5) year period during which non-priority creditors are paid in full, followed by stepped up larger payments to be remitted to the WCB until the HITNY deficit allocation is paid in full. However, the Debtor will be under no obligation to remit payment to the WCB in accordance with the Interim WCB Agreement if, through individual or group settlement, legislative resolution, litigation or any other negotiation or adjudication, the Debtor or its authorized representative reaches a more favorable resolution with the WCB.

## I.     Alternatives to the Plan

On  or about April 23, 2010 Debt Acquisition Group, LLC ("DAG") filed a plan of reorganization and related disclosure statement [Docket Nos. 274 and 275].  DAG filed a revised plan and accompanying disclosure statement on July 23, 2010 [Docket Nos. 306 and 307] (the "DAG Plan").  A Hearing regarding the adequacy of DAG's amended disclosure statement has not yet been scheduled or noticed to interested parties.  The DAG Plan contemplates a 45% distribution to most unsecured creditors over a two year period following the effective date of the DAG Plan, and potentially, a 20% distribution on account of the Debtor's alleged HITNY deficit allocation.  The DAG Plan is contingent on several conditions being satisfied including, without limitation, DAG obtaining DOH approval allowing their proposed Chief Restructuring Officer to operate the Nursing Home pending approval of its CON Application.  The DAG Plan also rests on the assumption that DAG will receive a permanent license authorizing it to operate the Nursing Home.  The Debtor's Plan neither contains such conditions, nor relies upon any such assumptions.

On July 1, 2010, Parkview Acquisition I, LLC ("Acquisition") filed a plan and disclosure statement (the "Acquisition Plan") [Docket Nos. 291 and 292].  Acquisition's disclosure statement has not yet been approved by this Court.  The Acquisition Plan proposes to pay all creditors in full, with the exception of the Debtor's Health Care Facility Cash Assessment ("HCFCA"), which Acquisition plans to pay over a period of three and one half (3 ½ ) years. The Acquisition Plan, however, like the DAG Plan, is contingent on several conditions being satisfied including, without limitation, the grant of Acquisition's Receivership Application with the Department of Public Health, which would allow Acquisition to operate the Nursing Home pending approval of its application for a permanent license.  Like DAG, Acquisition has also

assumed that it will receive a permanent license authorizing it to operate the Nursing Home. The Debtor's Plan neither contains such conditions, nor relies upon any such assumptions.

Another alternative to the Plan would be the conversion of this chapter 11 reorganization to a chapter 7 liquidation proceeding. If this proceeding was converted to one under chapter 7 of the Bankruptcy Code, a chapter 7 trustee would be appointed, who would have the right to retain counsel, whose fees and expenses are chargeable against property of the bankruptcy estate. The trustee would also be entitled, pursuant to statute, to a sliding percentage of every dollar held or collected on behalf of a chapter 7 bankruptcy estate. The Debtor submits that the expense and disruption associated with a chapter 7 trustee, coupled with the impact on the Nursing Home residents and employees, does not make conversion of this case to a proceeding under chapter 7 a viable alternative to the Plan.

**J.      Summary of Assets and Liabilities Subsequent to Liquidation of Assets**

1.      Assets

Attached hereto as **Exhibit C** is the Debtor's Liquidation Analysis (the "Liquidation Analysis"), which indicates that as of June 30, 2010, the Debtor's cash and cash equivalents totaled approximately $654,300.

2.      Liabilities and Expenses

As of June 30, 2010, as set forth in further detail on the annexed Liquidation Analysis, the Debtor's potential administrative liabilities totaled approximately $1,001,656, and pre-petition unsecured liabilities total $5,025,287. In addition, the WCB alleges that the Debtor has a HITNY deficit allocation liability in the amount of $1,488,339. As such, the Debtor's total liabilities as of June 30, 2010 are $7,515,282.00.

3. <u>Additional Administrative Expenses to be Incurred Through Confirmation</u>

It is contemplated that through confirmation, the Debtor will incur additional administrative expenses for professional fees and other expenses as set forth in the Liquidation Analysis annexed hereto.

## IV. SUMMARY OF THE PLAN

The following is a brief summary of certain provisions of the Plan. This summary does not purport to be complete, and Creditors are urged to read and review the Plan in full. A copy of the Plan is annexed hereto as **Exhibit A.**

### A. Introduction

The Plan is a plan of reorganization pursuant to which the Debtor proposes to pay non-priority general unsecured creditors 100% of their Allowed Claims and the Health Care Facility Assessment Priority Claim over a period of approximately three and one-half (3.5) years following confirmation, through the continued operations of the Nursing Home, located in Massapequa, New York. The Plan will also implement the Interim WCB Agreement with the WCB regarding certain alleged deficit allocations relating to the Debtor's former membership in HITNY. The Interim WCB Agreement contemplates that the Debtor will remit small monthly payments over the same three and one-half (3.5) year period during which non-priority creditors are paid in full, followed by stepped up, substantially larger, equal monthly payments, to be remitted to the WCB. Parkview will be under no obligation to continue performing in accordance with the payment terms of the Interim WCB Agreement if, through individual or group settlement, legislative resolution, litigation or any other negotiation or adjudication, Parkview or its authorized representative reaches a more favorable resolution with the WCB. Parkview is one of approximately 180 health care facilities throughout New York State that are represented by Duane Morris LLP in connection with ongoing proceedings concerning the

HITNY deficit liabilities. In addition, pursuant to the Plan, 100% of Allowed Priority Claims including the priority claims filed by the SEIU benefit funds shall be paid in full on the Effective Date or as soon as practicable thereafter. Employee claims for accrued vacation and sick time will not be impacted by the implementation of the terms of the Plan. Under the Plan, all employees will be entitled to use their accrued sick and vacation time in precisely the same manner as they were entitled to do pre-petition under the Collective Bargaining Agreement (the "CBA"), if applicable, or as otherwise agreed upon with non-union personnel.

The Debtor plans to implement the Plan by the continued operations of the Nursing Home and by the personal guarantees of the Debtor's Equity Interest Holders. Based upon the Nursing Home's recent and anticipated increased Medicaid reimbursement rates and projected increases to private pay residents at the Nursing Home, coupled with funds accumulated by the Debtor during the Bankruptcy Case, the Debtor projects that it will be able to pay all creditors in full over three and one-half (3.5) years, following the Effective Date, except for the HITNY deficit allocation, which will be paid in accordance with the Interim WCB Agreement, or as otherwise resolved through negotiations, adjudication or legislation. In no event shall the Debtor's obligations to the WCB for its HITNY deficit allocation be less favorable than the Interim WCB Agreement. The Debtor's projections, showing the Debtor's anticipated financial performance through 2013, along with a narrative regarding same, are attached hereto collectively as **Exhibit D.**

The Effective Date of the Plan is thirty (30) days after the date on which the Confirmation Order becomes a Final Order.

**B. Voting Procedures and Requirements**

1. <u>Ballots and Voting Deadlines</u>

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan. Your Claims may be classified in multiple classes. When you vote and return your Ballot, please indicate the Class or Classes in which your Claims are classified by marking the appropriate space provided on your Ballot for such purpose.

The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be filed with Duane Morris LLP, 744 Broad Street, Suite 1200, Newark, New Jersey 07102, Attention: Thelma Santorelli, Paralegal, by no later than 5:00 p.m. Eastern Standard Time on _____ __, 2010 (the "Voting Deadline"). Ballots not received by the Voting Deadline may not be counted, and Ballots that do not indicate either an acceptance or rejection of the Plan will be deemed to constitute an acceptance of the Plan.

If you have any questions regarding the procedure for voting, please contact:

> Walter J. Greenhalgh, Esq.
> Joseph H. Lemkin, Esq.
> DUANE MORRIS, LLP
> 744 Broad Street, Suite 1200
> Newark, New Jersey 07102
> (973) 424-2000, (973) 424-2001 Facsimile
> Email: wjgreenhalgh@duanemorris.com
>           jhlemkin@duanemorris.com
> *Counsel to the Debtor*

It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

2. <u>Parties in Interest Entitled to Vote</u>

Any Holder of a Claim against the Debtor whose Claim has not been Disallowed previously by the Bankruptcy Court, is entitled to vote to accept or reject the Plan if such Claim is impaired under the Plan and either (a) such Holder's Claim has been scheduled by the Debtor and is not scheduled as disputed, contingent or unliquidated, or (b) such Holder has filed a proof of Claim before the Bar Date. Any Claim to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder to whose Claim an objection has been made, temporarily allows such Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

3. <u>Definition of Impairment</u>

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

(a)  leaves unaltered the legal, equitable, and contractual rights of the Holder of such claim or equity interest; or

(b)  notwithstanding any contractual provision or applicable law that entitles the Holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

i) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

ii) reinstates the maturity of such claim or interest as it existed before such default;

iii) compensates the Holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

iv) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the Holder of such claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such Holder as a result of such failure; and

v) does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the Holder of such claim or interest.

4.      <u>Classes Under the Plan</u>

The Claims in Class 1 (Allowed Tax Priority Claims) are impaired under the Plan and, consequently, each holder of an Allowed Class 1 Claim is entitled to vote to accept or reject the Plan.

The Claims in Class 2 (Allowed Priority Claims) are unimpaired under the Plan and, consequently, each holder of an Allowed Class 2 Claim is conclusively presumed to have accepted the Plan, and is not entitled to vote to accept or reject the Plan.

The Claims in Class 3 (Allowed Employee Claims and Employee Priority Claims) are unimpaired under the Plan and, consequently, each holder of an Allowed Class 3 Claim is conclusively presumed to have accepted the Plan, and is not entitled to vote to accept or reject the Plan.

The Claims in Class 4 (Allowed Non-Priority General Unsecured Claims) are impaired and, accordingly, each holder of an Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

The Claim in Class 5 (WCB HITNY Claim) is impaired under the Plan and, consequently, the WCB is entitled to vote to accept or to reject the Plan.

The Claims in Class 6 (Equity Interests) are impaired and, accordingly, each holder of an Allowed Class 6 Claim is entitled to vote to accept or reject the Plan.

### C. Confirmation Procedure

1. <u>Confirmation Hearing</u>

A hearing before the Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge, has been scheduled for _____ __, 2010 at __:__ _.m. at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato United States Courthouse, 100 Federal Plaza, Central Islip, New York 11722, to consider confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

2. <u>Procedure for Objections</u>

Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be filed with the Bankruptcy Court and served on counsel for the Debtor, the United States Trustee, the Committee and all parties who have filed a notice of appearance by 5:00 p.m. Eastern Standard Time on _____ __, 2010. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

3. <u>Requirements for Confirmation</u>

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of Section 1129 of the Bankruptcy Code. Among the requirements for confirmation are that the Plan be: (a) accepted by all impaired classes of Claims and Equity Interests that are entitled to vote or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such class; (b) feasible; and (c) in the "best interests" of creditors and stockholders impaired under the Plan. The Bankruptcy Court also must find that:

      a.      The Plan has classified Claims in a permissible manner;

      b.      The Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

      c.      The Plan has been proposed in good faith.

4. <u>Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim in a particular Class only if such Claim is substantially similar to the other Claims in such class. The Plan creates separate classes to deal respectively with tax, employee, priority, Workers Compensation HITNY deficit allocation, unsecured claims and equity interests. The Debtor believes the Plan's classifications place substantially similar Claims in the same class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

5. <u>Voting and Acceptance of the Plan</u>

As a condition to confirmation of the Plan, the Bankruptcy Code requires each class of "impaired" Claims entitled to vote on the Plan to vote to accept the Plan. The Bankruptcy Code defines acceptance of a plan by a class of Creditors as acceptance by Holders of two-thirds (2/3) in dollar amount and more than one-half (½) in number of those claims actually voting.

Acceptance of the plan by a class of equity interests is defined as acceptance by Holders of two-thirds (2/3) of the number of shares actually voting. Holders of Claims who fail to vote will not be counted as either accepting or rejecting the Plan. A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Classes of claims that receive no distribution under a plan are conclusively presumed to have rejected the plan.

6.      Best Interests Test

The "best interests" of creditors test requires that each Holder of a Claim receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. To determine what members of each impaired Class of Claims would receive if the Debtor was liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtor's assets would generate in the context of a Chapter 7 liquidation sale. The amount available for satisfaction of Claims would consist of the proceeds resulting from the sale, reduced by the Claims of secured creditors, to the extent of the value of their collateral, and the costs and expenses of the liquidation. Because the Plan is a plan of reorganization that proposes to pay Creditors 100% of their claims over a three and one-half year period, except for the WCB HITNY deficit allocation claim which is subject to the Interim WCB Agreement (or other final resolution), each Class of Creditors will receive significantly better treatment than it would receive if the Debtor's Assets were liquidated pursuant to Chapter 7 of the Bankruptcy Code. In addition, because this is a plan of reorganization and not a Chapter 7 liquidation, while Creditors

receive payment in full, the Estate will neither be taxed with the additional expenses and commissions of a trustee nor delayed by a trustee's appointment and need to become familiar with this complex matter. Annexed as **Exhibit C** is the Debtor's Liquidation Analysis, which reflects the actual and projected costs through confirmation of the Debtor's Plan, which projects that funds will be available to distribute to certain classes of claims. Accordingly, the Debtor believes that the Plan satisfies the "best interests" of creditors test.

       7.    <u>The Feasibility Test</u>

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtor. Here, because the Debtor's Plan allows for the successful reorganization of the Debtor and the payout of debt according to a three and one-half year schedule that the Debtor can accommodate based on the cash on hand and continued operations of the Nursing Home, confirmation of the Plan will not be followed by a liquidation or further reorganization.

       8.    <u>The Fair and Equitable Test</u>

If any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance. To obtain such confirmation, the Debtor must show, among other things, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each impaired class of claims that has rejected the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class if, among other things, the plan provides: (a) with respect to secured claims, that each Holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims, that the Holder of any claim that is junior to the claims of such class will not receive or retain on account of such junior claim any property at all unless the

senior class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.

### 9. Other Requirements of Section 1129

The Debtor believes that the Plan meets all the other technical requirements of section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

**THE DEBTOR SHALL SEEK CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE AMOUNTS OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.**

### D. Classification of Claims and Interests and Their Treatment Under the Plan

The Plan classifies Claims into six (6) Classes, and also provides for payment of Allowed Administrative Expenses. For each Class, the Plan states whether the Claims are impaired and whether Holders of the Claims will receive various types of distributions under the Plan. The Classes and payments to be made and treatment proposed to be accorded to Allowed Claims of each Class under the Plan are summarized and described below. After Confirmation and upon the Effective Date, the Plan binds the Debtor, any creditor whether or not such creditor has accepted the Plan, and the Debtor shall be discharged of liability for the payment of debts to the extent specified in 11 U.S.C. §1141.

### 1. Unclassified Claims

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense claims are not placed into voting classes, they remain unclassified. These claims are not considered impaired and do not vote on the Plan because they are automatically entitled to

specific treatment as provided in the Bankruptcy Code and as set forth herein and in the terms of the Plan.

a.    <u>Administrative Claims</u>

In order to confirm a plan under 11 U.S.C. § 1129, a holder of an Administrative Claim with priority under Bankruptcy Code § 507(a)(2) must receive on account of such claim on the effective date of the plan, cash equal to the allowed amount of such claim, unless a holder of a particular claim has agreed to a different treatment with respect to such claim.

i.    Administrative Expense Claims

Administrative Expense Claims include the actual and necessary costs and expenses incurred during the Chapter 11 case and consist of any unpaid statutory fees due to the United States Trustee pursuant to 28 U.S.C. §1930 and fees and expenses of professionals retained by the Debtor and approved by the Court. All Administrative Expense Claims shall be paid in full as of the Effective Date of the Plan.

ii.    Professional Compensation and Reimbursement Claims

Pursuant to the Bankruptcy Code, the Bankruptcy Court must rule on all professional compensation and expenses before such compensation and expenses are allowed. The Professional Person(s) in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Bankruptcy Court must rule on the application. Only the amount of compensation and reimbursement of expenses allowed by the Bankruptcy Court will be owed and required to be paid under this Plan as an Administrative Expense Claim.

Each Professional Person who asserts an Administrative Expense Claim that accrues before the Confirmation Date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, a final application for compensation and reimbursement of

expenses no later than sixty (60) days after the Effective Date of the Plan.  Failure to timely file such an application shall result in the Professional Person's Claim being forever barred and discharged.

iii.    Statutory Fees

No motion or application is required to fix the fees payable to the Clerk's Office or Office of the United States Trustee as such fees are determined by statute and payable in full on the Effective Date.  The Debtor is current with the payment of statutory fees and does not anticipate any additional fees, other than those fees falling due for the current quarter.  Quarterly fees and other related expenses shall be paid by the Debtor until the Effective Date, but if any quarterly fees become due and owing subsequent to Effective Date, such quarterly fees shall be paid promptly.

2.    Classified Claims

The following describes the Plan's classification of those Claims against the Debtor required to be classified under the Bankruptcy Code:

a.    Class One: Allowed Tax Priority Claims

Class One consists of Allowed Priority Tax Claims, i.e. claims asserted against the Debtor's estate by governmental entities which are entitled to priority in payment under Bankruptcy Code § 507(a)(8).  Except to the extent that a holder of an Allowed Class 1 Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Class 1 Claim will be paid in full, after payment in full of Allowed Administrative Expense Claims and in strict accordance with the claims priority hierarchy established by the Bankruptcy Code. Payments to allowed Class 1 claimants shall be made pro-rata with Non-Priority General Unsecured Claims via quarterly installments made co-extensive

with payments to Non-Priority General Unsecured Claims in Class Four commencing thirty (30) days after the Effective Date, until paid in full.

Class 1 is impaired under the Plan, and consequently, each holder of an Allowed Class 1 Claim is entitled to vote to accept or reject the Plan.

b.    Class Two: Allowed Priority Claims

Class 2 consists of the Allowed Priority Claims of the SEIU benefit funds (the "Funds").  This Class includes all claims asserted by the Funds for amounts due to the Funds by the Debtor which accrued within 180 days of the Petition Date.  Payments on account of Allowed Priority Claims shall be made in full on the Effective Date, or as soon as practicable thereafter.  The Allowed Class 2 Priority Claims of the SEIU amount to $497,304.71, which can be broken down as follows: (i) Benefit Fund: $349,242.71; (ii) Pension Fund: $122,991.68; (iii) Education Fund: $8,358.81; (iv) Child Care Fund: $8,352.61; (v) Job Security Fund: $4,179.45; (vi) Worker Participation Fund: $4,179.45.  Any and all additional priority claims filed by the SEIU Funds on behalf of the Debtor's employees are deemed expunged under the Plan.

Class 2 is unimpaired under the Plan, and consequently, each holder of an Allowed Class 2 Claim is conclusively presumed to have accepted the Plan, and is not entitled to vote to accept or reject the Plan.

c.    Class Three: Allowed Employee Claims

Class 3 consists of the Allowed Employee Claims and Allowed Employee Priority Claims of the Debtor's employees, including claims asserted for benefits accruing during and prior to the 180 day period prior to the Petition Date.  Claims for accrued vacation and sick time will not be impacted by the terms of this Plan, as these benefits will continue to accrue and will be accessible for Employee use in the ordinary course and in the same fashion as such benefits

have accrued and have been accessible for employee use pre-petition, whether under the CBA, if applicable, or otherwise.

No employee holds a claim for unpaid wages accruing within or outside of the 180 days of the Petition Date. All wage claims accrued within 180 days of the Petition Date were paid in full in accordance with a prior order of the Court, and no wage claims exist for the period outside 180 days of the Petition Date.

Class 3 is unimpaired under the Plan, and consequently, each holder of an Allowed Class 3 Claim is conclusively presumed to have accepted the Plan, and is not entitled to vote to accept or reject the Plan.

     d.    <u>Class Four: Allowed Non-Priority General Unsecured Claims</u>

Class 4 consists of Allowed Non-Priority General Unsecured Claims. Claims not specifically otherwise classified or treated under the Plan shall also be treated as Class 4 Claims. Except to the extent that a holder of an Allowed Class 4 Claim has been paid by the Debtor prior to the Effective Date or agrees to different treatment, Allowed Class 4 Claims will be paid in full, after payment in full of Allowed Administrative Expense Claims and Allowed Priority Claims and in strict accordance with the claims priority hierarchy established by the Bankruptcy Code. Holders of Class 4 Claims will receive payment on heir allowed claims via quarterly installments co-extensive with, and on a pro-rata basis with distributions being paid to Class 1 Allowed Priority Tax Claimants, commencing thirty (30) days after the Effective Date.

The SEIU Benefit Funds are granted Allowed Class 4 Non-Priority General Unsecured Claims in the amount of $969,729.04, which can be broken down as follows: (i) Benefit Fund: $674,548.29; (ii) Pension Fund: $209,139.97; (iii) Education Fund: $17,340.26; (iv) Child Care Fund: $16,498.11; (v) Job Security Fund: $8,721.38; (vi) Worker Participation Fund: $43,481.03.

Class 4 is impaired under the Plan, and consequently, Allowed Class 4 Claims will be entitled to vote to accept or reject the Plan.

      e.      <u>Class Five: Workers Compensation Board HITNY Claim</u>

Class 5 consists of the Class 5 Consists of the disputed claim of the WCB relative to the Debtor's alleged pro-rata deficit allocation for HITNY, a self insured workers compensation group of which the Debtor was formerly a member. The Debtor and the WCB have agreed to an interim resolution of the Debtor's deficit allocation. Pursuant to the Interim WCB Agreement, commencing 30 days after the Effective Date, co-extensive with payments to Class 1 and Class 4 Creditors, the Debtor will remit monthly payments to the WCB in the amount of $3,750.00 which payments shall continue until the earlier of the date that Debtor completes payments to Class 1 and Class 4 Creditors and 42 months from the date of Plan Confirmation, at which time the Debtor will increase the monthly payment to the WCB to $25,056, until the disputed HITNY deficit allocation in the amount of $1,488,339.18 is paid in full. Under the Plan, Parkview will be under no obligation to remit payment under the terms of the WCB Interim Agreement if, through individual or group settlement, legislative resolution, litigation or any other negotiation or adjudication, Parkview or its authorized representative reaches a more favorable resolution with the WCB. In the event the Debtor (independently or collectively with other former HITNY members) reaches a more favorable final resolution with the WCB, whether through settlement negotiations, legislative resolution, or through litigation, the Plan provides that the Debtor will be authorized to abandon the Interim WCB Agreement and immediately implement the terms of a final negotiated, legislated or adjudicated resolution, without leave of the Bankruptcy Court, so long as the resolution does not impact distributions under the Plan. Under the Plan, if a resolution more favorable to the Debtor is not reached, the Debtor and the WCB will be bound by the terms of the Interim WCB Agreement as set forth in

the Plan.  In the event litigation ensues and the Debtor either agrees to be a party or is required to be a necessary party, nothing in the Plan of Reorganization or the Confirmation Order shall preclude the Debtor from being named a party or preclude said litigation from being venued in State Court, where jurisdiction shall lie.  Nor shall the Debtor be entitled to rely upon any stay, discharge or injunctive provisions in the Code, the Plan or the Confirmation Order as a defense to any claims, counterclaims, set-off or recoupment that may be asserted by the WCB in connection with such litigation.

Class 5 is Impaired under the Plan, and consequently, Allowed Class 5 Claims will be entitled to vote to accept or reject the Plan.

      f.     <u>Class Six: Equity Interests</u>

Class 6 consists of Equity Interests in the Debtor, including, without limitation, options, warrants and other rights to acquire Equity Interests in the Debtor.  Each holder of an Equity Interest will retain his/her Equity Interest and will not receive any distributions under the Plan.  Moreover, each holder of an Equity Interest are also personally and unconditionally providing guarantees for the Debtor's obligations under the Plan to Class 1, Class 2 and Class 4 Creditors.

Class 6 is unimpaired under the Plan, and consequently each holder of an Allowed Class 6 Interest is conclusively presumed to have accepted the Plan and will not be entitled to vote to accept or reject the Plan.

**E.**    **Implementation of the Plan**

As set forth in Article IX, the Plan is a plan of reorganization pursuant to which the Debtor proposes to pay creditors 100% of their Allowed Claims over a period of three and one-half (3.5) years through continued operations of the Nursing Home and through the use of funds

accumulated by the Debtor during the pendency of the Bankruptcy Case. The Plan will also implement the Interim WCB Agreement and will provide guarantees of the Debtor's obligations to Class 1, Class 2 and Class 4 Creditors, to be provided by Equity Interest Holders.

Based upon the Nursing Home's recent and anticipated increased reimbursement rates and projected increases to private pay residents at the Nursing Home, coupled with funds accumulated by the Debtor during the pendency of the Bankruptcy Case, the Debtor projects that it will be able to pay creditors in full over three and one-half (3.5) years, following the Effective Date. The projections also reflect the Debtor's ability to implement the Interim WCB Agreement.

1.    Funding for the Plan

The Plan will be funded by the proceeds of the Debtor's continued operations of the Nursing Home and through funds which the Debtor has accumulated during the pendency of the within Chapter 11 proceeding. The Debtor proposes to pay all creditors 100% of their allowed claims over a period of approximately three and one-half (3.5) years and will also implement the Interim WCB Agreement.

2.    Accounts Receivable

The Debtor will continue to collect outstanding accounts receivable in the ordinary course of its operations.

3.    Avoidance Actions

The right to bring Avoidance Actions, to prosecute Avoidance Actions, and to settle, subject to Court approval, Avoidance Actions, shall be vested solely and exclusively in the Debtor. The Debtor will also have the exclusive discretion to determine the number and timing of distributions of the proceeds of Avoidance Actions. Notwithstanding any provision of this Plan to the contrary, and subject to the limitation that proceeds of Avoidance Actions will be

used solely and exclusively to (a) pay the costs associated with the pursuit of Avoidance Actions including reasonable attorneys' fees and (b) pay creditors in strict accordance with the claims priority hierarchy established by the Bankruptcy Code, all Avoidance Actions shall remain the property of the Debtor's estate from and after the Confirmation Date.

4.    Other Assets

The Debtor will have sole discretion to compromise, settle or otherwise resolve any remaining assets not specifically addressed in the Plan.

5.    Corporate Governance and Management of the Debtor

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate the Nursing Home as a Debtor-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect. Thereafter, management, control and operations of the Debtor will remain with the current principals.

6.    Revesting of Assets

Under the Plan, pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estate of the Debtor will revest in the Debtor on the Effective Date without the payment or incursion of transfer tax liability pursuant to section 1146(a) of the Bankruptcy Code. Thereafter, subject to the terms of the Plan, the Debtor may operate its businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of the Debtor shall be free and clear of all Liens, Claims and Equity Interests, except as specifically provided in the Plan and the Confirmation Order.

7. <u>Distributions</u>

    a.    Payment of Administrative Claims, Statutory Fees, and Payment of Claims in Unimpaired Classes (Class Two and Class Three Claims)

Payment of all Administrative Claims, Statutory Fees and payments to holders of allowed Claims in Classes Two and Three will be made in cash on the Effective Date or as soon thereafter as is practicable.

    b.    Distributions to Holders of Class One Tax Priority Claims, Class Four General Unsecured Claims and the Class Five Workers Compensation Board Claim

Distributions to holders of Class One Tax Priority Claims, Class Four General Unsecured Claims and Class Five Workers Compensation Claim shall be made initially on the first day of the month which follows thirty days after the Effective Date and thereafter: (i) to Class One and Class Four claimants in quarterly installments over three and one-half years, until paid in full; (ii) to the WCB in monthly installments in accordance with the Interim WCB Agreement, or as otherwise resolved.

    c.    Manner of Distributions

At the option of the Debtor, distributions pursuant to the Plan may be made in cash, by wire transfer or by a check drawn on a domestic bank. No distributions shall be made on Claims that are less than twenty-five ($25.00) dollars in amount, unless request is made, in writing, to the Debtor.

    d.    Unclaimed Distributions

As a condition to participation under the Plan, all creditors who are to receive a distribution under the Plan must claim the amount distributed, such as the presentment of any check distributed, within 120 days of the date disbursed. Any funds which have been distributed but remain unclaimed on the 120 day Anniversary of the initial distribution to any class will be

barred from participating in any further distributions under the Plan, to such class, and such unclaimed funds, if any, will be included in future distributions in accordance with the Plan.

8.    Termination of the Committee

The appointment of the Committee will terminate upon completion of distributions to Class 4 Claimants.

9.    Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the board of directors of the Debtor pursuant to the Plan shall be deemed to have occurred and will be in effect from and after the Effective Date pursuant to the applicable general corporation law of the state in which the Debtor is incorporated, without any requirement of further action by the board of directors of the Debtor.

10.    Executory Contracts and Unexpired Leases to be Rejected

Pursuant to the Plan, except as to any executory contract which has been assumed prior to the date of the Confirmation Date, all prepetition executory contracts and unexpired leases shall be deemed rejected as of the Effective Date of the Plan, unless a motion to assume with respect to any executory contract or unexpired lease is pending as of the Confirmation Date.

Under the Plan, the CBA between the Debtor and the SEIU will be assumed as of the Effective Date.  In addition, under the Plan, claims arising out of the rejection of any executory contract or unexpired lease pursuant to Article VIII of the Plan, and/or claims for payment of cure amounts associated with the assumption of any executory contract or unexpired lease must be filed with the Clerk of the Court and served upon the Debtor and the Committee no later than 30 days after the later date of (i) notice of entry of an order approving the assumption or rejection of such executory contract or unexpired lease or (ii) notice of entry of the Confirmation Order. All claims not filed within such time will forever be barred from asserting against the Debtor, its

bankruptcy Estate, and its property. To the extent timely rejection damages claims are filed and allowed, the same shall be treated as Class 4 claims.

11.  Retention of Jurisdiction

Pursuant to the terms of the Plan, the Court shall retain jurisdiction after Confirmation for the following purposes:

(a) Classification:  The classification of Claims or Interests and the reexamination of Claims that have been allowed for purposes of voting only, and the determination of such objections as may be filed to Claims.  The failure by the Debtor or other party-in-interest to object to, or to examine any claim for the purposes of voting, shall not be deemed to be a waiver of the Debtor's right, in accordance with Article VII of the Plan, to later timely object to, or reexamine the Claim in whole or in part.

(b) Disputes:  Determination of all questions and disputes regarding title to the assets of the Debtor and the determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the Confirmation Date between the Debtor, the Committee, and any other Persons, including, but not limited to, any right of the Debtor to recover assets pursuant to the provisions of title 11 of the United States Code, and, more particularly for the Debtor to pursue the Avoidance Actions.

(c) Corrections:  The correction of any defects, the curing of any omission, or the reconciliation of any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan.

(d) Modification:  The modification of this Plan after the Confirmation Date.

(e) Interpretation:  To enforce and interpret the terms and conditions of the Plan.

(f) Enforcement:  Entry of any Order, including injunctions, necessary to enforce the title, right and powers of the Debtor and to impose such limitations, restrictions, terms and conditions

of such title, right and powers as this Court may deem necessary, including, without limitation, orders to enforce the Plan.

(g) Termination of Cases: Entry of any Order concluding and terminating this Reorganization Case.

(h) Causes of Action: To hear and determine causes of action by or against the Debtor arising prior to commencement of, or during the pendency of, this Reorganization Case, including but not limited to Avoidance Actions.

(i) Fees: To hear and determine fee applications of Professionals or other Claims, and to resolve any dispute arising under the Plan, including but not limited to any dispute regarding Professional fees, and to consider any modification or amendment of the Plan.

(j) Implementation: At any time, the Court may issue Orders and give directives to the Debtor and other parties to implement and enforce the Plan pursuant to section 1142 of the Bankruptcy Code.

(k) Taxes: To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

(l) Other Matters: For all other purposes and matters to the extent that subject matter jurisdiction exists for this Court under the Code, as currently enacted or subsequently amended.

12. Procedures for Resolving Contested Claims

On the Effective Date of the Plan there may exist claims that are disputed as to their classification (i.e. secured, priority, unsecured) or their amount, in whole or in part. Under the Plan, a claim or any portion of a claim which is disputed as of the Confirmation Date, but which becomes allowed Post-Confirmation will be treated in accordance with Article IV of the Plan.

In addition, under the Plan, except as to applications for allowance of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, the Debtor as to all Claims shall, on and after the Effective Date, have the exclusive right to make and file objections to claims. On and after the Effective Date, the Debtor will have the authority to compromise, settle or otherwise resolve any objection filed by the Debtor on behalf of the Estate. Unless otherwise ordered by the Bankruptcy Court, all objections to claims that are the subject of proofs of claim or requests for payment shall be filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses) and serve such objections upon the holder of a claim as to which the objection is made as soon as is practicable, but in no event later than 120 days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

13. <u>Notices under the Plan</u>

To be effective, all notices, requests and demands to or upon the Debtor under the Plan must be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of facsimile transmission, when received and telephonically confirmed, addressed as follows:

> **To Debtor:**
> Duane Morris LLP
> 744 Broad Street
> Suite 1200
> Newark, New Jersey 07102
> Fax: (973) 424-2001
> Attn: Walter J. Greenhalgh, Esq.
>
> **To The Committee:**
> Ruskin Moscou Faltischek, P.C.
> East Tower – 15th Floor
> 1425 RXR Plaza
> Uniondale, New York 11556-1425
> Fax: (516) 663-6717
> Attn: Michael S. Amato, Esq.

## V.   EFFECT OF CONFIRMATION OF PLAN

### A.   Effectuating Documents and Further Transactions

The Debtor is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary and appropriate to effectuate and further evidence the terms and conditions of the Plan.

### B.   Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the board of directors of the Debtor pursuant to the Plan shall be deemed to have occurred and will be in effect from and after the Effective Date pursuant to the applicable general corporation law of the state in which the Debtor is incorporated, without any requirement of further action by the board of directors of the Debtor.

### C.   Exculpation

Under the Plan, neither the Debtor, the Committee or any of their respective members, managers, officers, directors, employees, advisors, Professionals or agents shall have or incur any liability to any holder of a Claim or Interest for any action or omission in connection with, related to, or arising out of the Reorganization Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct and gross negligence, and, in all respects, the Debtor, the Committee and each of their respective members, managers, officers, directors, employees, advisors, Professionals and agents will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### D. Injunction

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date all entities that have held, currently hold or may hold a Debt, Claim, other liability or interest against or in the Debtor that would be discharged upon Confirmation of the Plan and the Effective Date but for the provisions of Bankruptcy Code § 1141(d)(3) will be permanently enjoined from taking any of the following actions on account of such Debt, Claim, liability, interest or right: (i) commencing or continuing in any manner any action or other proceeding on account of such Debt, Claim, liability, interest or right against property that is to be distributed under this Plan or; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any property to be distributed to creditors under the Plan.

Pursuant to the Plan, on and after the Effective Date, each holder of an equity interest in the Debtor will be permanently enjoined from taking or participating in any action that would interfere or otherwise hinder the Debtor from implementing the Plan or the Confirmation Order.

Further, except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date all creditors of, claimants against, stockholders of, and persons having or claiming an interest of any nature in the property or assets of the Debtor will be permanently enjoined and stayed from pursuing or attempting to pursue any action, commencing or continuing any action, employing any process, or any act against the Debtor on account of or based upon any right, claim or interest which any such creditor, claimant, equity security holder, or other person may have had prior to the entry of the Confirmation Order.

### E.    Medicaid Program

Notwithstanding anything contained in the Plan:

(a)    Claims arising from payments made by the Medicaid Program (Title XIX of the Social Security Act (42 U.S.C. §1396 et. seq.)), New York State Public Health Law and Social Services Laws, the regulations promulgated thereunder and the State Medicaid Plan (the "Medicaid Program") for periods commencing January 1, 2008 and through and including the Effective Date, shall be subject to recoupment and/or set-off by the New York. State Department of Health ("DOH"), shall survive the discharge, and shall not be subject to the injunctive provisions of the Plan or the provisions of the Bankruptcy Code.

(b)    Medicaid Program claims that arise after January 1, 2008, shall be subject to recoupment and/or set-off in conformance with the Medicaid Program and the Debtor shall be subject to all the rules, regulations and policies of the Medicaid Program in the ordinary course of business. Such recoupment and/or set-off shall be limited to five percent (5%) of weekly amounts remitted to the Debtor under the Medicaid Program.  Such five percent (5%) cap shall continue through and including forty-two months following the Effective Date of the Plan, provided that the Debtor remains current on its payment of the Cash Receipts Assessment (N. Y. Public Health Law 2807-d).

(c)    To the extent that, as the result of any litigation, rate appeal or other rate adjustment regarding the calculation of rates of reimbursement for care or services provided to beneficiaries of the Medicaid program (42 U.S.C. 1396, et seq.), the reasonableness and adequacy of such rate or compliance with related procedural requirements, the Debtor becomes entitled to additional Medicaid reimbursement, the New York State Department of Health shall be entitled to recoup and apply all such amounts to reduce the amounts due to be paid to the

Department by Debtor on the cash receipts assessment and Medicaid overpayments in order to allow the payment of such amounts that arise after the Effective Date to be fully paid in a more expedited fashion. Notwithstanding the contents of this paragraph to the contrary, initial payment of the rebased rates pursuant to PHL 2808(2-b)(b) for periods on and after April 1, 2009, shall only be subject to recoupment at a rate of 5%.

### F.    No Limitations on Effect of Confirmation

Nothing contained in the Plan or this Disclosure Statement will limit the effect of Confirmation as set forth in Bankruptcy Code § 1141.  Confirmation will bind the Debtor, all Creditors, Equity Interest Holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Equity Interest of such Creditor or Equity Interest Holder is Impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted the Plan.

### G.    Preservation of Avoidance Actions and Rights of Action

The Plan also provides that the Debtor will continue to review information regarding potential Avoidance Actions and Rights of Action, which review is ongoing.  Under the Plan, the Debtor reserves the right to commence prosecution of, or continue to prosecute, Avoidance Actions/Rights of Action, whether arising prior to or after the Petition Date, in any court or other tribunal.   Unless an Avoidance Action/Right of Action is expressly waived, relinquished, released, compromised or settled in the Plan or by any Final Order, the Debtor, on behalf of itself, the Committee, any subsequently appointed Trustee, or any other assignee, has expressly reserved, under the Plan, all Avoidance Actions/Rights of Action for later adjudication and, therefore, according to the terms of the Plan, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable or otherwise) or laches shall apply to any such Avoidance Action/Right of Action upon Confirmation or consummation of the Plan.

### H. Modification of Plan

The Debtor may alter, amend or modify the Plan at any time prior to Confirmation and thereafter as provided in Bankruptcy Code § 1127(b). However, the Bankruptcy Court may require a new disclosure statement and/or revoting on the Plan if the Debtor modifies the plan before Confirmation.

The Debtor may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) the Bankruptcy Court authorizes the proposed modification after notice and a hearing. Under the Plan, the Debtor seeks to reserve the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

### I. Withdrawal Of The Plan

The Plan provides that the Debtor will reserve the right to withdraw the Plan at any time before the entry of the Confirmation Order, in which event the Plan shall be deemed null and void.

### J. Good Faith

Confirmation of the Plan will constitute a finding that the Plan has been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code.

### K. Post-Confirmation Payment of Fees

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to Final Decree.

L.    **Post-Confirmation Conversion/Dismissal**

The Plan provides that a creditor or party in interest may bring a motion to convert or dismiss the Bankruptcy Case under Bankruptcy Code § 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Bankruptcy Code § 1112(b). Also, under the Plan, if the Bankruptcy Court orders the case converted to chapter 7 after the Plan is confirmed, then all property that had been property of the chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Bankruptcy Court during this case.  In addition, any Allowed Claims for Administrative Expenses which are not paid on the Effective Date, and those Post Effective Date Fees which are not paid prior to conversion, shall continue to be entitled to administrative priority, under 11 U.S.C. § 507(a)(1) in any such subsequent Chapter 7 case to which this case is converted.

M.    **Entire Agreement**

According to the Plan, the Plan and this Disclosure Statement and exhibits hereto set forth the entire agreement and understanding of the parties relating to the subject matter of the Plan and Disclosure Statement and supersede all prior discussions and documents.  Under the Plan, no party shall be bound by any terms, conditions, definitions, warrants, understandings or representations with respect to the subject matter of the Plan and Disclosure Statement, other than as in expressly provided for in said documents or as may be subsequently agreed by the parties in writing.

N.    **Severability**

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void

or unenforceable with respect to the holder or holders of such Claims or Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision in the Plan.

### O.      Governing Law

Under the Plan, except to the extent the Bankruptcy Code, Bankruptcy Rules or other law is applicable, or to the extent any provision of the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law or such jurisdiction.

### P.      Headings

Headings are used in the Plan for convenience and reference only, and will not constitute a part of the Plan for any other purpose.

### Q.      Exhibits/Schedules

All exhibits and schedules to the Plan and this Disclosure Statement, are incorporated into and are a part of the Plan as if set for in full herein.

### R.      Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor, the Committee, the holders of Claims and Interests and their respective successors and assigns.

## VI.     CERTAIN TAX CONSEQUENCES OF THE PLAN

SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES DISCUSSED BELOW.   THEREFORE, EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN.   NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.  ALL CREDITORS ARE URGED TO CAREFULLY REVIEW THE TAX DISCLOSURE PROVIDED HEREIN.

THE FOREGOING IS A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.   THE TAX CONSEQUENCES OF THE PLAN COULD BE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  THEREFORE, EACH HOLDER OF A CLAIM IS STRONGLY URGED NOT TO RELY ON THE FOREGOING AND TO CONSULT HIS OR HER OWN TAX ADVISOR REGARDING SUCH CONSEQUENCES.

## VII. CONCLUSION

The Debtor believes that the Plan provides the best available alternative for maximizing the recoveries that Creditors may receive from the Debtor's estate. Therefore, the Debtor recommends that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

Date: August 2, 2010


**PARKVIEW CARE AND REHABILITATION CENTER, INC.**


By: _____